# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Remington Lodging & Hospitality, LLC,** | **Case No. 1:24cv2031** |
| **Plaintiffs,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Cleveland Airport Hospitality II, LLC, et al.,** | **MEMORANDUM OPINION & ORDER** |
| **Defendants** | |

Currently pending is Plaintiff/Counterclaim Defendant Remington Lodging & Hospitality, LLC's (hereinafter "Remington") Partial Motion to Dismiss the Counterclaims of Defendants/Counterclaimants Cleveland Airport Hospitality II, LLC; Cleveland Strongsville Hospitality, LLC; Cleveland South Hospitality, LLC; and Columbus Worthington Hospitality, LLC. (Doc. No. 19.)  Defendants/Counterclaimants filed a joint Brief in Opposition on April 10, 2025, to which Remington filed a Reply on April 24, 2025.  (Doc. Nos. 22, 29.)   For the following reasons, Remington's Motion (Doc. No. 19) is GRANTED IN PART and DENIED IN PART, as set forth herein.

## I.     Factual Allegations[1]

---

[1] In setting forth the facts, the Court considers the factual allegations in the Counterclaims. (Doc. No. 16.)  In addition, and because they are expressly referenced in the Counterclaims and are central thereto, the Court also considers the Hotel Management Agreements at issue, which are attached as Exhibits to Remington's Complaint. (Doc. Nos. 6-1 through 6-4; Doc. Nos. 31-1 through 31-4.)   *See Bassett v. National Collegiate Athletic Ass'n,* 528 F.3d 426, 430 (6th Cir. 2008) (noting that, in ruling on a Rule 12(b)(6) motion, a court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.").  *See also Brent v. Wayne County Dep't of Human Services,* 901 F.3d 656, 694 (6th Cir. 2018).

The Counterclaim sets forth the following facts. Each of the Counterclaimants own a hotel within the State of Ohio. (Doc. No. 16 at PageID# 197.) Specifically, Counterclaimants Cleveland Airport Hospitality II, LLC ("Airport"), Cleveland South Hospitality, LLC ("South"), and Columbus Worthington Hospitality, LLC ("Worthington") own Doubletree Hotels in Westlake, Independence, and Columbus, Ohio, respectively; and Counterclaimant Cleveland Strongsville Hospitality, LLC ("Strongsville") owns a Best Western Hotel in Strongsville, Ohio. (*Id.*) Counterclaimants Airport, South, and Worthington entered into separate Doubletree Franchisor Agreements with Hilton Franchise Holding LLC ("Hilton") in 2013 and 2014. (*Id.*) Counterclaimant Strongsville entered into a Best Western Membership Agreement with BWH Hotels ("BWH") in February 2021. (*Id.* at PageID# 198.) The Court will refer to the Counterclaimants collectively as "the Hotels."

### A.      The Hotels and Remington engage in negotiations

In late 2022, the Hotels approached several hotel management companies, including Remington, about potentially managing the Hotels. (*Id.*) At that time, the Hotels were managed by Twin Tier Hospitality, LLC ("Twin Tier"), an in-house hospitality management company. (*Id.*) Remington, and the other management company candidates, submitted proposals to Twin Tier in the form of financial *pro formas*. (*Id.*) These *pro formas* contained the candidates' projected financial performances for each of the Hotels over a five-year period. (*Id.*)

Twin Tier and Remington entered into negotiations over a potential management arrangement in early 2023. (*Id.*) During the negotiation period, Twin Tier shared information about the Hotels with Remington in furtherance of due diligence and disclosure. (*Id.*) Additionally, Remington sent one of its employees, Willis Cheng, to visit the Hotels. (*Id.*) Saket Duggal, vice president of Twin

2

Tier, and Mr. Cheng had multiple conversations about the Hotels.  (*Id.*)  At no time did Mr. Cheng, or anyone at Remington, ever express concern to Twin Tier about the condition of the Hotels.  (*Id.*)

According to the Hotels, "[i]t became clear that Remington was eager to secure The Hotels' management business."  (*Id.*)  For example, Remington represented to the Hotels that Remington had inside connections with Hilton management that Remington could leverage to benefit the efforts of Airport, South, and Worthington to retain and/or renew their Franchisee statuses with Hilton.  (*Id.*)  Also during negotiations, Keith Oltchick, Remington's Chief Development Officer, represented to the Hotels that Hilton told Remington that Hilton wanted the Hotels to enter into management agreements with Remington as a pressure tactic to persuade the Hotels into doing business with Remington.  (*Id.* at PageID# 199.)

The Hotels allege that "[w]hat set Remington apart from the other management candidates, however, was Remington's unambiguous promise that it would meet the projected performance set forth in its *pro forma* proposal."  (*Id.*)  Specifically, the Hotels allege that "[w]hile all management candidates' projections were similar, only Remington promised The Hotels that Remington would guarantee its *pro forma* projections."  (*Id.*)  "During a meeting between Mr. Satish Duggal, Mr. Saket Duggal, Mr. Oltchick, and Remington's General Counsel Jim Cowan in or around April 2023, Mr. Oltchick represented to Mr. Satish Duggal, president of Twin Tier, and Mr. Saket Duggal that Remington guaranteed it would hit these *pro formas* and would even include this guarantee within the management agreements themselves."  (*Id.*)  "Mr. Oltchick represented to Mr. Satish Duggal and Mr. Saket Duggal that Remington was the only company that could hit the *pro forma* projections for The Hotels."  (*Id.*)

### B.      The Hotel Management Agreements

3

Relying on Remington's alleged promise to achieve specific annual financial results for the Hotels in accordance with the *pro formas*, the Hotels entered into four substantially identical Hotel Management Agreements (the "HMAs") with Remington in or around April 2023.  (*Id.*)  The Hotels allege that "[t]rue and correct copies of the HMAs are attached to Remington's Complaint as Exhibits 1-4."[2]  (*Id.*)

The HMAs each provide that "Owner [i.e., the Hotel] desires to have Manager [i.e., Remington] manage and operate the Hotel, and Manager is willing to manage and operate the Hotel for the account of the Owner, in accordance with the terms and conditions of this Agreement."  *See, e.g.,* Doc. No. 31-1 at PageID# 451.   In return, the Hotels agreed to pay Remington certain management fees, including a "Base Management Fee ... equal to Two and One-Half percent (2.5%) of monthly Gross Revenues" and an "Incentive Management Fee ... equal to fifteen percent (15%) of Gross Operating Profit in excess [sic] annual budgeted Gross Operating Profit."  (*Id.* at PageID#s 451, 455.)  The HMAs provided for an initial term of five (5) years with the potential for renewal. (*Id.* at PageID# 452.)

Notably for purposes of the instant Motion, the HMAs each contain a provision entitled "Termination for Convenience."   Specifically, Section 1.01(E)(b) of the HMAs provides as follows:

> **b.  Termination for Convenience**. Manager recognizes that Manager's financial proforma for years 1-5 for the Hotel, attached hereto as Exhibit E, constitutes a material consideration for the Owner's consent to this Agreement.  For each year, the Hotel's actual financial performance fails to meet Ninety-two percent (92%) of the GOP results set forth in Exhibit E, Owner shall have the right to terminate this Agreement upon 60 days prior written Notice to Manager.  Such notice must be given within 30 days of the receipt by Owner of the annual Profit and loss statement referenced in Section 5.01B or it is waived for that operating year.  This provision deletes "DISCLAIMER" set forth in Exhibit E.  Additionally, Owner and Manager

---

[2] The parties agree that each of the four HMAs are substantially identical, for purposes of the instant Motion.

4

> agree that [sic] Agreement cannot be terminated for failing to achieve proforma results in any year where rooms are out of inventory for renovations or due to Force Majeure.

(*Id*. at PageID# 452.)

An "Exhibit E" is attached to each of the HMAs. Each "Exhibit E" is a two page chart which, although difficult to read, appears to set forth projected profits and expenses for each Hotel for the years 2023 through 2028. *See* Doc. No. 6-1 at PageID#s 77-78; Doc. No. 6-2 at PageID#s 103-104; Doc No. 6-3 at PageID#s 129-130; Doc. No. 6-4 at PageID#s 155-156. At the very bottom of each "Exhibit E" there is a "DISCLAIMER." (*Id*.) As set forth above, pursuant to Section 1.01(E)(b) of the HMAs, the parties agreed to delete the DISCLAIMER, which provides as follows:

> This analysis does not take into account nor make provision for any possible rise or decline in local or general economic conditions. The projections have been prepared based on information made available to Remington Hotels and on Remington Hotels' experience in the hotel industry. However, Remington Hotels does not warrant, guarantee, or make any representation with respect to any of the projections set forth in this analysis. Projections are subject to uncertainty and variation and therefore are not represented as results that will actually be achieved. The projections are for information only and are not intended as an inducement for action or investment. There is no obligation to revise or update the projections to reflect subsequent changes in the information or assumptions on which they were made.

(*Id*.) *See also* Doc. No. 16 at PageID# 200.

The HMAs further provide that Remington would submit annual Operating Budgets and Annual Business Plans that allegedly "accounted for Remington's *pro forma* guarantees to The Hotels for The Hotels' approval." (Doc. No. 16 at PageID# 200.) Specifically, Section 5.03(A) of the HMAs provides, in relevant part:

> The "Operating Budget" shall be a preliminary operating budget for the upcoming Operating Year prepared by Manager [i.e., Remington] in Manager's then-current format, which shall be in a form substantially consistent with the Uniform System and include, among other things, estimates of the Gross [sic], Revenues, Operating Expenses, Management Fees and Reimbursements and Operating Profit, cash flow and EBITDA less Replacement Reserves for the Operating Year (on a monthly and

5

annual basis) and a comparison with the prior Operating Year, assumptions in narrative form, and such other estimates and details as Owner [i.e., the Hotel] reasonably requests.  The "Marketing Plan" shall be a preliminary marketing plan for the upcoming Operating Year prepared by Manager in Manager's then-current format, which shall include, among other things, a marketing budget, a comparison with the prior Operating Year Marketing Plan and marketing expenditures, details in narrative form, and such other sales and marketing information as Owner reasonably requests. The 'CapEx Budget' shall be a preliminary capital expenditures budget for the next two (2) Operating Years prepared by Manager in Manager's then-current format, which shall include estimates for use of the Reserve.  The Operating Budget, the Marketing Plan and the CapEx Budget comprise the "Annual Business Plan". **Manager shall submit to Owner for approval the Annual Business Plan for the upcoming Operating Year no later than sixty (60) days prior thereto.  Owner shall review and respond to such Annual Business Plan within thirty (30) days of receipt.**  If expenses included in the Annual Business Plan as a whole or any specific items thereof have not been rejected in writing by Owner within thirty (30) days after submission to Owner, then the Annual Business Plan or such items shall be deemed approved.  **If Owner rejects expenses included in the Annual Business Plan as a whole or any specific items thereof prior to the expiration of such period, then Owner and Manager shall confer and use good faith to reach a resolution thereof and may submit unresolved matters to Expert Resolution.** \*\*\*

*See, e.g.,* Doc. No. 31-1 at PageID#s 457-458 (emphasis added).  Section 5.03(B) provides, in relevant part, that "Manager [i.e., Remington] makes no assurances that the actual expenses, revenues or other performance metrics of the Hotel will correspond to estimates in the Approved Budget."  (*Id.* at PageID# 458.)

Lastly, the HMAs each contain an integration clause (Section 13.08(A)) that provides that "[t]his Agreement constitutes the entire agreement between the parties (and supersedes all prior understandings and writings) and may be changed only by a writing signed by the parties."  (*Id.* at PageID# 467.)

### C.    Remington Allegedly Fails to Perform and the HMAs are Terminated

The Hotels allege that "[i]t quickly became clear Remington was not up to the task of managing The Hotels."  (Doc. No. 16 at PageID# 200.)  For example, two of the Hotels' general

managers—hired by Remington—were placed on 30-day improvement plans and another hotel went six months without a permanent general manager.  (*Id*.)  In addition, the Hotels allege that "Remington repeatedly struggled to collect on Accounts Receivable and offered The Hotels' sales staffs little to no support." (*Id*.)

On October 16, 2023, Satish Duggal and Saket Duggal met with Sloan Dean, Remington's Chief Executive Officer, about whether Remington was capable of assisting Airport, South, and Worthington in securing franchise extensions with Hilton, in exchange for the properties agreeing to complete Property Improvement Plans ("PIPs") with Hilton.  (*Id*. at PageID# 201.)  Mr. Dean responded, "That's why you hired us. We'll get it done." (*Id.*)  The Hotels allege, however, that "Remington did not get it done."  (*Id*.)  Instead, "multiple guest satisfaction metrics—including guests' ratings of cleanliness and overall service—dropped significantly compared to prior years' guest satisfaction metrics, when Twin Tier self-managed the properties."  (*Id*.)  In addition, Remington also allegedly "failed to deliver millions of dollars in promised financial performance to The Hotels, pursuant to the HMAs, during its short tenure as manager."  (*Id*.)

In November 2023, Remington submitted its proposed 2024 Operating Budgets and Annual Business Plans to the Hotels, pursuant to Section 5.03(A) of the HMAs.  (*Id*.)  According to the Hotels, "[t]he expenses and costs that Remington proposed in its Budgets and Plans would have prevented Remington from meeting the financial *pro forma* results it promised to The Hotels."  (*Id*.)  Mr. Dean, on behalf of Remington, requested a meeting with the Hotels.  (*Id*.)

On December 12, 2023, Mr. Dean, along with several other individuals from Remington, met with Satish Duggal and Saket Duggal.  (*Id*. at PageID#s 201-202.)  Mr. Dean began the meeting by stating that, while Remington had promised it would achieve the *pro formas* as part of its obligations

7

under the HMAs, Remington had "screwed up" and "would not be able to live up" to the *pro formas* in the HMAs.  (*Id*. at PageID# 202.)  Satish Duggal responded that the *pro formas* were the key reason the Hotels entered into the HMAs with Remington.  (*Id*.)  Mr. Dean responded that "Remington screwed up" and that Remington's 2024 budgets "would not be able to mirror" the *pro formas* in the HMAs.  (*Id*.)  Satish Duggal observed that Remington struggled to properly manage revenue, had no discernible cost control measures or sales strategy, and failed to properly hire and oversee staff, which all contributed to Remington's inability to achieve the *pro forma* results it promised in the HMAs. (*Id*.)  In response, Remington did not request additional time to revise their 2024 budgets or propose an alternative resolution.  (*Id.*)  Instead, Mr. Dean ignored Satish Duggal's feedback, suggested that the parties may "choose to go their separate ways," and ended the meeting.  (*Id.*)

Shortly thereafter, on December 15, 2023, the Hotels sent Notices of Default to Remington, which put Remington on notice that failure to cure each default within 30 days would be a ground for termination of the HMAs.  (*Id*.)  The Hotels then attempted to negotiate a resolution with Remington during a follow-up conference call on December 19, 2023.  (*Id*.)  Mr. Dean opened the December 19, 2023 meeting by telling the Hotels that Remington wished to end its relationship in a "positive" fashion and that the HMAs would be terminated effective January 31, 2024.  (*Id*. at PageID#s 202-203.)  Mr. Dean also allegedly promised the Hotels that Remington would not recruit any of the Hotels' employees, and that Remington would not tell any personnel not on the December 19, 2023 conference call about the parties' impending separation.  (*Id*. at PageID# 203.)  According to the Hotels, however, Remington "broke its promise almost immediately," which had the effect of "exacerbat[ing] the quality assurance problems Remington created at The Hotels."  (*Id*.)

8

Per the HMAs, Remington was obligated to provide the Hotels with final financial statements at the end of its tenure as manager.  (*Id*.)  The Hotels allege however that, as of January 31, 2024, when management responsibilities reverted from Remington back to Twin Tier, Remington had not yet provided the obligatory financial statements to the Hotels.  (*Id*.)  The Hotels allege that, despite repeated requests, Remington failed to provide financial statements to the Hotels until April 11, 2024, by which time the Hotels had already retained a forensic accountant "to calculate the missing financial statements from scratch."  (*Id*. at PageID#s 203-204.)

### D.     The Aftermath of Remington's Alleged Failure to Perform

The Hotels allege that "[b]etween Remington's one-two punch of undelivered promised financial results and a marked decline in year-over-year revenue, The Hotels lacked the cash on hand to finance the various improvements and renovations that [Airport, South, and Worthington] needed to complete to maintain their franchise status with Hilton."  (*Id*. at PageID# 204.)  Thereafter, Hilton terminated South and Worthington's Doubletree Franchise Agreements on November 20, 2024, and declined to renew Airport's Doubletree Franchise Agreement when it expired on December 31, 2024.  (*Id*.)  The Hotels allege that Hilton's termination and/or refusal to renew Franchise Agreements were the direct and proximate result of "Remington's eight months of mismanagement of, and abrupt termination of its management duties to, The Hotels."  (*Id*. at PageID#s 204-205.)

Due to Hilton's termination of South and Worthington's Doubletree Franchise Agreements, and decision not to renew Airport's Franchise Agreement, the Hotels were required to seek out a new franchisor to ensure that the properties could remain open.  (*Id*. at PageID# 205.)  Ultimately, Airport, South, and Worthington signed new franchise agreements with a different, non-Hilton franchisor in or around late November 2024.  (*Id*.)  Since transitioning their properties from a Hilton-affiliated to

a non-Hilton-affiliated brand, Airport, South, and Worthington's occupancies have significantly declined.  (*Id.*)

## II.    Procedural History

On November 20, 2024, Remington filed a Complaint in this Court, in which it alleged that the Hotels breached their obligations under the HMAs by failing to pay Remington the amounts due and owing under those Agreements.[3]  (Doc. No. 1.)   On January 21, 2025, the Hotels filed an Answer to Remington's Complaint.  (Doc. No. 16.)  On that same date, the Hotels also filed Counterclaims against Remington for (1) negligent misrepresentation (Count I); and (2) breach of contract against Airport, South, Worthington, and Strongsville (Counts II through V).  (*Id.*).

On March 11, 2025, Remington filed its Answer to the Hotels' Counterclaims. (Doc. No. 20.) In addition, Remington filed a Partial Motion to Dismiss the Hotels' Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. No. 19.)  Remington filed a Brief in Opposition on April 10, 2025, to which the Hotels replied on April 24, 2025.[4]  (Doc. Nos. 22, 29.)

## III.   Standard of Review

---

[3] Due to confidentiality clauses in the HMAs, Remington initially filed a redacted version of its Complaint that did not attach copies of each of the HMAs.  (Doc. No. 1.)  The Court later granted Remington leave to file an unredacted Complaint, along with copies of the HMAs as Exhibits thereto under seal.  (Doc. No. 5.)  Remington filed its Complaint and Exhibits under seal on November 22, 2024.  (Doc. No. 6.)  During the Case Management Conference ("CMC"), this Court ordered that, if the Hotels wished for any part of the Complaint and/or Exhibits to remain under seal, the Hotels must file an appropriate motion by no later than May 6, 2025.  (Doc. No. 28.) The Hotels thereafter filed an Unopposed Motion to Modify Prior Order regarding Sealing of Documents, in which it requested that the Court issued an Order: (1) unsealing the Complaint, (2) unsealing the HMA exhibits to the Complaint, except for the numbers contained within the HMAs' Exhibit Es, and (3) redacting only the numbers contained within the HMAs' Exhibit Es.  (Doc. No. 30.)  The Court granted the Motion on May 6, 2025, and Remington filed an unredacted version of the Complaint on the public docket, as well as copies of the HMAs with the limited redactions as described above as Exhibits thereto, on May 13, 2025.  (Doc. No. 31.)

[4] Meanwhile, the Court conducted a CMC on April 23, 2025, at which it set various case management deadlines.  (Doc. No. 28.)  At the request of the parties, those deadlines were subsequently extended on August 22, 2025.

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'" *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–556 (2007)).  For purposes of both Rule 12(b)(6) and Rule 12(c), "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007) (internal citation and quotation marks omitted).

The measure of a Rule 12(b)(6) challenge — whether the Complaint raises a right to relief above the speculative level — "does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir.2008) (quoting in part *Twombly,* 550 U.S. at 555–556). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim

11

is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)).  Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

## IV.    Analysis

In its Motion, Remington seeks dismissal of the Hotels' (1) negligent misrepresentation claim; and (2) certain sub-claims within its breach of contract counts.  (Doc. No. 19.)  The Court will address Remington's arguments separately, below.

### A.    Breach of Contract (Counts II through V)

In Counts II through V, each of the Hotels assert separate breach of contract claims against Remington based on Remington's alleged breaches of the respective HMAs.  (Doc. No. 16 at PageID#s 206-211.)  Each breach of contract claim is substantially identical.  (*Id.*)  In these Counts, the Hotels first allege that "[i]n violation of its duty of good faith and fair dealing, Remington negotiated the [relevant HMA] with [the Hotels] without disclosing that Remington was unable to comply with" or "had no intention of complying with" its "obligations to achieve specific annual financial results on behalf of [the Hotels]."  (*Id.* at PageID#s 206-211, ¶¶ 54 (as to Airport), 63 (as to Strongsville), 72 (as to South), 81 (as to Worthington)).

The Hotels further allege that, in violation of the relevant HMA, "Remington refused to submit to [the Hotels] a proposed annual budget and business plan that incorporated the specific financial results Remington committed to achieving for [the Hotels]."  (*Id.* at ¶¶ 56, 65, 74, 83.)  The Hotels allege that "Remington's refusal to submit a compliant proposed annual budget and business

12

plan were Events of Default under the terms of the [relevant HMA], which Remington subsequently refused to cure after [the Hotels] allowed Remington the opportunity to do so." (*Id*. at ¶¶ 57, 66, 75, 84.)  Lastly, the Hotels allege that they have incurred significant damages as a result of Remington's alleged breaches and that, in addition to these damages, the Hotels are entitled to reasonable attorney's fees and costs pursuant to Sections 11.03 and 13.05 of the HMAs.[5] (*Id*. at ¶¶ 58-59, 67-68, 76-77, and 85-86.)

In its Motion, Remington argues that the breach of contract counterclaims discussed above should be dismissed because they are based on the incorrect premise that Remington guaranteed that it would achieve the results reflected in the *pro formas* attached to the HMAs as Exhibit E.  (Doc. No. 19 at PageID#s 224-227.)  Remington argues that no provision in the HMAs actually contains such a promise by Remington.  (*Id*.)  Rather, Remington argues that Section 1.01(E)(b) "merely grants each Defendant the right to terminate its HMA prior to the expiration of an initial or renewal term in the event that the corresponding hotel does not achieve at least 92% of the profits set forth on the *pro forma* in a particular year."  (*Id*.)  Thus, according to Remington, Section 1.01(E)(b) reflects a condition – not a promise of future performance.  (*Id*.)  Remington further asserts that, in light of the integration clause, any allegation that it orally promised during contract negotiations to achieve the *pro forma* results is barred by the parol evidence rule.  (*Id*.)  Accordingly, Remington argues that "the

---

[5] The Hotels also allege that Remington breached the HMAs by "failing to manage and operate the hotel pursuant to the hotel's brand standards."  (Doc. No. 16 at PageID#s 206-211, ¶¶ 55, 64, 73, 82.)  Remington does not seek dismissal of this breach of contract subclaim.  *See* Doc. No. 19 at PageID#s 223, 227at fns 2 and 5.

counterclaims[6] must be dismissed to the extent that they rely on the incorrect premise that Remington promised to achieve the *pro forma* results."  (*Id.*)

In response, the Hotels argue that Remington's Motion should be denied because Remington "ignore[s] key provisions within Sections 1.01(E)(b), 5.03(A), and Exhibit E of the HMAs" and asks the Court to "read the HMAs' language in isolation, rather than reading the contract as a whole." (Doc. No. 22 at PageID#s 265-268.)  The Hotels assert that, when the HMAs are properly read as a whole, it is clear that Section 1.01(E)(b) does not merely grant the Hotels the right to terminate the HMAs.  (*Id.*)  To the contrary, the Hotels note that "Remington expressly acknowledged in Sections 1.01(E)(b) that the *pro formas* 'constitute[d] a material consideration for the Owner's consent to this Agreement.'"  (*Id.*)  Thus, the Hotels maintain that the plain language of the HMAs reflects that Remington agreed that the *pro formas* themselves were material to the Hotels' decision to enter the HMAs. (*Id.*)  In addition, the Hotels emphasize the importance of the deletion of the "DISCLAIMER" set forth in Exhibit E, arguing that "Remington's deletion of the 'DISCLAIMER' demonstrates that it intended the *pro formas* to induce The Hotels into agreeing to the HMAs by guaranteeing the projections contained therein."  (*Id.*)  The Hotels further argue that the budget approval process set forth in Section 5.03(A) "incorporates the *pro formas* because it lists the same categories of financial information as Exhibit E."  (*Id.*)

The Hotels next assert that, "[e]ven if the Court *did* conclude that § 5.03(A) did not require Remington to submit an Operating Budget that complied with its *pro formas* in Exhibit E, The Hotels nevertheless sufficiently alleged that Remington breached the HMAs by refusing to cure its Events

---

[6] Remington maintains that the Hotels' negligent misrepresentation claim in Count I should also be dismissed for this reason. The Court will discuss the Hotels' negligent misrepresentation claim separately, in Section IV.B of this Opinion.

14

of Default." (*Id.*)  As set forth above, pursuant to Section 5.03(A), the Hotels were required to "review and respond" to Remington's Annual Business Plan within 30 days of receipt, and if the Hotels "reject[ed] expenses included in the Annual Business Plan . . . then Owner and Manager shall confer and use good faith to reach a resolution thereof." (*Id.*)  Here, the Hotels argue that they have adequately alleged a claim that Remington breached its obligations to confer and use good faith to reach a resolution under Section 5.03(A). (*Id.*)

In its Reply Brief, Remington argues that the Hotels' "opposition identifies no provision setting forth a covenant by Remington to achieve the *pro forma* results – because there is none." (Doc No. 29 at PageID# 313.)  Remington emphasizes that the HMAs do not provide that Remington shall achieve any particular results, or that Remington promises, guarantees, or warrants that it will achieve specified results. (*Id.*)  Remington asserts that the language in Section 1.01(E)(b) indicating that the *pro formas* constitute a "material consideration" is nothing more than "a recital, not a covenant by either party to do anything." (*Id.* at PageID# 314.)  Likewise, Remington maintains that the deletion of the "DISCLAIMER" simply "ensures that Remington cannot seek to avoid [the Hotels'] early-termination rights by virtue of the disclaimer." (*Id.* at PageID# 315.)  Thus, Remington argues that the Hotels' breach of contract claims necessarily fail to the extent they rely on the premise that Remington promised to achieve the *pro forma* results.

Lastly, Remington argues that the Court should reject the Hotels' assertion in their Brief in Opposition that Remington breached Section 5.03(A) of the HMAs when Remington allegedly failed to confer and use good faith to reach a resolution of the parties' dispute regarding the Annual Operating Budget. (*Id.* at PageID#s 317-318.)  Remington first argues that this characterization of the Hotels' breach of contract claim fails because "this was manifestly not the theory on which [the

15

Hotels] asserted a breach of Section 5.03 in their Counterclaims." (*Id*.) And, even if the Hotels' Counterclaims could be considered to assert such a claim, Remington argues that it nonetheless fails because the Hotels affirmatively allege that the parties did, in fact, confer regarding Remington's proposed budget on December 12, 2023 and December 19, 2023. (*Id*.)

"Under Ohio law,[7] the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *Asset Mgmt. One LLC v. U.S. Bank Nat. Ass'n*, 569 Fed. Appx. 438, 441 (6th Cir. 2014) (quoting *V & M Star Steel v. Centimark Corp*., 678 F.3d 459, 465 (6th Cir. 2012)). *See also Gerling & Associates, Inc. v. Odulair, LLC*, 2017 WL 2790669 at * 7 (S.D. Ohio June 28, 2017).

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc*., 524 F.3d 754, 763 (6th Cir. 2008) (citations omitted). *See also Ohio Historic al Soc'y v. Gen. Maint. & Eng'g Co.,* 583 N.E.2d 340, 345 (Ohio App. 10th Dist. 1989). It is the role of the court to discern the intent of the parties, which is "presumed to reside in the language they choose to use in their agreement." *Savedoff,* 524 F.3d at 763 (quoting *Graham v. Drydock Coal Co*., 667 N.E.2d 949, 952 (Ohio 1996)). *See also United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 716 N.E.2d 1201, 1208 (Ohio App. 2nd Dist. 1998). "[C]ommon words appearing in the written instrument are to be given their plain and ordinary meaning unless manifest absurdity results or unless some other meaning is clearly intended from the face or overall contents of the instrument."

---

[7] The HMAs provide that they "shall be construed under and shall be governed by the laws of the State of Ohio without regard to conflicts of laws principles." *See, e.g*., Doc. No. 31-1 at PageID# 466.

*Alexander v. Buckeye Pipe Line Co*, 374 N.E.2d 146, 150 (Ohio 1978).  "The Court must look to the plain language of the contract, and only go beyond the plain language of the agreement to determine the rights and obligations of the parties if it is ambiguous."  *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123 at *2 (N.D. Ohio Sept.20, 2011) (internal citations omitted).

"Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations."  *Covington v. Lucia*, 784 N.E.2d 186, 190 (Ohio App. 10th Dist. 2003) (citation omitted).  *See also Lager v. Miller–Gonzalez*, 896 N.E.2d 666, 669 (Ohio 2008)("Ambiguity exists only when a provision at issue is susceptible of more than one reasonable interpretation."); *Sec'y of USAF v. Commemorative Air Force*, 585 F.3d 895, 900 (6th Cir.2009). "[C]ourts may not use extrinsic evidence to create an ambiguity; rather, the ambiguity must be patent, i.e., apparent on the face of the contract."  *Covington,* 784 N.E.2d at 190.  In determining whether contractual language is ambiguous, the contract "must be construed as a whole," *Tri–State Group, Inc. v. Ohio Edison Co*., 782 N.E.2d 1240, 1246 (Ohio App. 7th Dist. 2002), so as "to give reasonable effect to every provision in the agreement."  *Stone v. Nat'l City Bank*,  665 N.E.2d 746, 752 (Ohio App. 8th Dist. 1995).

For the following reasons, the Court finds that the plain language of the HMAs is clear and unambiguous that Remington did not promise that it would achieve the *pro forma* financial results in Exhibit E to each HMA.  As Remington correctly notes, the Hotels do not direct this Court's attention to any provision of the HMAs in which Remington expressly promises, warrants, or guarantees that it will achieve the *pro forma* financial results.  While the Hotels rely most heavily on Section 1.01(E)(b), the plain language of that provision (which is entitled "Termination for Convenience") does not provide that Remington will or shall achieve the *pro forma* results.  Rather, in that Section,

17

the parties recognize that the financial *pro formas* constitute "a material consideration" for the Hotels' decision to enter into the HMAs and provide the Hotels with the ability to terminate the HMAs if the Hotels' "actual financial performance fails to meet Ninety-two percent (92%) of the GOP results set forth in" the *pro formas*.  In other words, HMAs provide an express right of termination to the Hotels based on Remington's failure to meet the *pro formas*.  This is not the same as providing that Remington promises or guarantees to meet the specific financial results set forth in those *pro formas*.

The Hotels nonetheless argue that the deletion of the "DISCLAIMER" provision implicitly demonstrates that the parties intended for Remington to promise to achieve *the pro forma* results. The Court disagrees. The deletion of the 'DISCLAIMER" does not, standing alone, create an affirmative contractual promise or guarantee by Remington to achieve the *pro formas*.  Rather, and construing the HMAs as a whole, the Court agrees with Remington that the deletion of the "DISCLAIMER" language simply ensures that Remington cannot seek to avoid the termination right set forth in Section 1.01(E)(b) by virtue of the disclaimer.

The Court also rejects the Hotels' argument that the budget approval process set forth in Section 5.03(A) supports the conclusion that Remington promised to achieve the *pro formas*.  The Hotels assert that, under this Section, Remington "was required to propose to The Hotels an 'Operating Budget' that included the same categories of financial information found on Exhibit E" and, therefore, "§ 5.03(A) incorporates the *pro formas*."  (Doc. No. 22 at PageID#s 267-268.)  As an initial matter, the copies of Exhibit E attached to the HMAs herein (particularly the first pages of the two-page Exhibit Es) are blurry and difficult to read.  Thus, it is not entirely clear to this Court that

18

the Exhibit E *pro formas* do, in fact, contain all of the "same information" outlined in Section 5.03(a).[8]

More importantly, even if Section 5.03(A) did require Remington to submit an Annual Business Plan that included some or all of the same financial information set forth in the respective *pro formas* attached to the HMAs as Exhibit E, the Court is not persuaded that this constitutes (or otherwise supports the finding of) a contractual guarantee by Remington that it will meet the specific financial results set forth in those *pro formas*. Indeed, there is no mention of the *pro formas* at all in Section 5.03(a), much less any provision that Remington promises or guarantees to achieve the financial results set forth in the *pro formas*. [9]

Accordingly, and for all the reasons set forth above, the Court finds that Remington is entitled to dismissal of the Hotels' breach of contract Counterclaims (Counts II through V) to the extent they allege that Remington breached the HMAs because it failed to achieve the *pro forma* results set forth in the "Exhibit E" documents attached to the HMAs.

The parties next disagree regarding whether the Hotels' Counterclaims II through V sufficiently plead a claim that Remington breached Section 5.03(A) of the HMAs when it failed to confer and use good faith to reach a resolution with the Hotels regarding its proposed Annual Business

---

[8] As set forth *supra,* Section 5.03(A) requires Remington to prepare an Operating Budget that includes "among other things, estimates of the Gross [sic], Revenues, Operating Expenses, Management Fees and Reimbursements and Operating Profit, cash flow and EBITDA less Replacement Reserves for the Operating Year (on a monthly and annual basis) and a comparison with the prior Operating Year, assumptions in narrative form, and such other estimates and details as Owner [i.e., the Hotel] reasonably requests." (Doc. No. 31-1 at PageID# 457.) That Section also requires Remington to provide a "Marketing Plan" for the upcoming Operating Year, as well as a "CapEx Budget" for the next two Operating Years. (*Id*. at PageID#s 457-458.)

[9] As noted *supra*, the HMAs each contain an integration clause (Section 13.08(A)) that provides that "[t]his Agreement constitutes the entire agreement between the parties (and supersedes all prior understandings and writings) and may be changed only by a writing signed by the parties." (Doc. No. 31-1 at PageID# 467.) The Court agrees with Remington that, in light of this clause, any allegations that, during contract negotiations, Remington "guaranteed" that it would achieve the pro forma results would be barred by the parol evidence rule.

Plan.[10]  Remington argues that this claim necessarily fails because it "relies on the mistaken premise that Remington promised to achieve the *pro forma* results."  (Doc. No. 29 at PageID# 317.)  Specifically, Remington argues that, if the Court agrees with Remington that the HMAs do not include a provision requiring Remington to achieve the *pro formas*, then the Court must necessarily reject the Hotels' claim that Remington breached Section 5.03(A) by failing to include an Annual Business Plan that incorporates those *pro forma* results.  (*Id*.)  The Hotels disagree, maintaining that even assuming the Court finds that Remington did not promise to achieve the *pro forma* results, this breach of contract subclaim survives because the Hotels have sufficiently alleged generally that Remington "breached the HMAs by refusing to cure its Events of Default."  (Doc. No. 22 at PageID# 268.)

In their Counterclaims, the Hotels allege, in relevant part, that the parties "agreed, pursuant to § 5.03 of the HMAs, that Remington would submit annual Operating Budgets and Annual Business Plans that accounted for Remington's *pro forma* guarantees to The Hotels for The Hotels' approval." (Doc. No. 16 at PageID# 200, ¶ 21.)  The Hotels further allege that, in November 2023, Remington submitted its proposed 2024 Operating Budgets and Annual Business Plans to The Hotels pursuant to § 5.03(A) and that "the expenses and costs that Remington proposed in its Budgets and Plans would have prevented Remington from meeting the financial *pro forma* results it promised to The Hotels." (*Id*. at PageID# 201, ¶ 26.)  The Hotels allege that Sloan Dean (on behalf of Remington) then

---

[10] As noted *supra*, Section 5.03(A) of the HMAs provides, in relevant part, that "[i]f Owner rejects expenses included in the Annual Business Plan as a whole or any specific items thereof ..., then Owner and Manager shall confer and use good faith to reach a resolution thereof and may submit unresolved matters to Expert Resolution."  *See, e.g.,* Doc. No. 31-1 at PageID# 458.

requested a meeting with Satish Duggal and Saket Duggal of Twin Tier, which occurred on December

12, 2023.  (*Id*. at ¶ 28.)  The Hotels then allege as follows:

> 29.  Mr. Dean began the December 12, 2023 meeting by stating that while Remington had promised it would achieve the *pro formas* as part of its obligations under the HMAs, Remington had "screwed up" and "would not be able to live up" to the *pro formas* in the HMAs.  Mr. Satish Duggal responded that the *pro formas* were the key reason The Hotels entered into the HMAs with Remington.  Mr. Dean responded that "Remington screwed up" and that Remington's 2024 budgets "would not be able to mirror" the *pro formas* in the HMAs. Mr. Satish Duggal observed that Remington struggled to properly manage revenue, had no discernible cost control measures or sales strategy, and failed to properly hire and oversee staff, which all contributed to Remington's inability to achieve the *pro forma* results it promised in the HMAs.

> 30.  **In response, Remington did not request additional time to revise their 2024 budgets or propose an alternative resolution. Instead, Mr. Dean ignored Mr. Satish Duggal's feedback and suggested that the parties may "choose to go their separate ways."  Mr. Dean then ended the meeting**.

> 31.  Due to Remington's failure to provide a budget that would achieve at least 92% of the *pro forma* results, The Hotels sent Notices of Default to Remington on December 15, 2023. These Notices of Default put Remington on notice that Remington's failure to cure each default within 30 days would be a ground for termination of the HMAs.

(*Id*. at PageID# 202, ¶¶ 29-31) (emphasis added).  The Hotels allege that they "attempted to negotiate

a resolution with Remington regarding Remington's Defaults during a follow-up conference call on

December 19, 2023" but that Remington "opened the December 19, 2023 meeting by telling The

Hotels that Remington wished to end its relationship in a 'positive' fashion and that the HMAs would

be terminated effective January 31, 2024."  (*Id.* at PageID#s 202-203, ¶¶ 32, 33.)

In the body of Counts II through V, the Hotels allege that "[i]n violation of the terms of the []

HMA[s], Remington refused to submit to [the Hotels] a proposed annual budget and business plan

that incorporated the specific financial results Remington committed to achieving for [each Hotel]."

(*Id.* at PageID#s 206-211, ¶¶ 56, 65, 74, 83.) The Hotels further allege that "Remington's refusal to submit a compliant proposed annual budget and business plan were Events of Default under the terms of the [] HMA[s],[11] which Remington subsequently refused to cure after [the Hotels] allowed Remington the opportunity to do so." (*Id.* at ¶¶ 57, 66, 75, 84.)

The Court finds as follows. As set forth *supra,* this Court has found that the HMAs do not provide that Remington promised or guaranteed to achieve the *pro formas*. Nor does Section 5.03(A) provide that Remington's Annual Business Plans must include, or incorporate, the *pro forma* financial results. Thus, the Court agrees with Remington that the Hotels' claim (in Paragraphs 56, 65, 74, and 83 of the Counterclaims) that Remington breached the HMAs when it "refused to submit to [the Hotels] a proposed annual budget and business plan that incorporated the specific financial results Remington committed to achieving for [each Hotel]" is subject to dismissal.

The Court disagrees with Remington, however, that the Hotels have not plead *any* viable breach of contract claim under Section 5.03(A). While that Section does not require Remington to submit an annual business plan that incorporates the *pro formas* set forth in Exhibit E to the HMAs, it does require the Hotels and Remington, as a general matter, to "confer and use good faith to reach a resolution" of any rejection by the Hotels of Remington's proposed business plan. Here, the Hotels allege that they rejected Remington's Annual Business Plan in December 2023 and that Remington "did not request additional time to revise their 2024 budgets or propose an alternative resolution" and

---

[11] Section 11.01 provides in relevant part that: "Any of the following shall constitute an 'Event of Default' under this Agreement: *** (E) The failure of either party to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of such failure for a period of thirty (30) days after written notice of such failure; provided, however, that if such failure cannot reasonably be cured within such thirty (30)-day period, then it shall be an Event of Default if the defaulting party fails to commence the cure of such failure within such thirty (30)-day period or thereafter fails to diligently pursue such efforts to completion. Any notice given by a party pursuant to this Section shall state the specific reason(s) therefor and, if applicable, the specific action(s) the noticed party can take to cure the applicable failure." *See, e.g.*, Doc. No. 31-1 at PageID#s 462-463.

22

instead "ignored [the Hotels'] feedback and suggested that the parties 'may choose to go their separate ways.'" (Doc. No. 16 at PageID# 202, ¶ 30.)  The Hotels further allege that they then sent Remington Notices of Default on December 15, 2023 (*Id*. at ¶ 31), but that Remington "subsequently refused to cure [the default] after [the Hotels] allowed Remington the opportunity to do so" (*Id*. at PageID#s 207-211, ¶¶ 57, 66, 75, 84.) Upon careful consideration, the Court concludes that the above allegations are sufficient to plead a breach of contract claim against Remington under Section 5.03(A) of the HMAs.

Accordingly, and for all the reasons set forth above, the Court grants Remington's Motion to Dismiss Counts II through V to the extent those Counts allege that Remington breached the HMAs by failing to (1) achieve the *pro forma* financial results set forth in the "Exhibit E" documents attached to the HMAs; and/or (2) submit a proposed annual budget and business plan that incorporated the *pro forma* financial results.  However, the Court denies Remington's Motion to Dismiss Counts II through V to the extent those Counts allege that Remington breached Section 5.03(A) of the HMAs when it failed to confer and use good faith to reach a resolution of the Hotels' rejection of Remington's proposed business plan.

### B.    Negligent Misrepresentation (Count I)

In Count I, the Hotels allege that "in the course of negotiating the HMAs with The Hotels, Remington made various factual misrepresentations and misstatements to The Hotels regarding Remington's willingness and ability to achieve specific financial results for The Hotels." (Doc. No. 16 at PageID# 205, ¶ 44.)  The Hotels allege that "Remington's misrepresentations were, in fact, false" and that "[t]o the contrary, Remington knew, or should have known, that it was unable to achieve its promised annual financial results."  (*Id*. at ¶ 45.)  The Hotels further allege that

23

"Remington failed to exercise the reasonable care or competence necessary to accurately communicate its ability (or, rather, inability) to achieve such specific financial results for The Hotels." (*Id*. at ¶ 46.)  The Hotels allege that they "justifiably relied upon Remington's misrepresentations when they entered into the HMAs" and "paid Remington management fees with the belief that Remington would achieve specific annual financial results for The Hotels."  (*Id*. at PageID# 206, ¶¶ 47, 48.)  The Hotels allege that Remington failed to achieve the specific annual financial results at issue, and that the Hotels were damaged as a direct and proximate result of Remington's misrepresentations.  (*Id*. at ¶¶ 48, 49.)

In its Motion, Remington first argues that this claim is subject to dismissal because it is based on the incorrect premise that Remington promised to achieve the *pro forma* results.  (Doc. No. 19 at PageID# 227.)  Remington next argues that, even assuming *arguendo* that the Hotels are able to establish that the HMAs do contain such a promise, the Hotels' negligent misrepresentation claim nevertheless fails as a matter of law for two reasons.  (*Id.* at PageID#s 228-231.)  First, Remington argues that this claim fails because the Hotels fail to allege that Remington was in the business of supplying information for the guidance of others, which Remington argues can only occur in the context of "special relationships" (such as where the defendant is a professional in the business of rendering opinions to others) and not in ordinary business transactions such as that at issue herein. (*Id*.)  Second, Remington argues that this claim fails because "the alleged misrepresentations do not constitute actionable false information since they relate solely to promises of future conduct."  (*Id*.)

In response, the Hotels argue that they have sufficiently plead a negligent misrepresentation claim because Remington is a hotel management company and is, therefore, in the business of providing information about hotel management to its clients, including the Hotels.  (Doc. No. 22 at

PageID#s 269-274.)  The Hotels assert that a "special relationship" is not a required element of a negligent misrepresentation claim and that the Hotels need only plead that Remington supplied information for the Hotels' guidance in their business transaction, knowing that the Hotels would rely on that information.  (*Id.*)  Regarding Remington's argument that this claim fails because it relates to future conduct, the Hotels maintain that its negligent misrepresentation claim "is not simply about Remington's broken promise, but [about] Remington's misrepresentation about its capabilities at the time the parties negotiated the HMAs." (*Id.*)

Under Ohio law, the elements of a negligent misrepresentation claim are: (1) one who, in the course of his or her business, profession or employment, or in any other transaction in which he or she has a pecuniary interest; (2) supplies false information for the guidance of others in their business transactions; (3) is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information; (4) if he or she fails to exercise reasonable care or competence in obtaining or communicating the information.  *See Abboud v. Liberty Mutual Ins. Group, Inc.,* 711 Fed. Appx. 773, 777 (6th Cir. 2017) (citing *Delman v. City of Cleveland Heights*, 534 N.E.2d 835, 838 (Ohio 1989). *See also Nazareth Deli LLC v. John W. Dawson Ins. Inc.,* 200 N.E.3d 652, 669 (Ohio App. 10th Dist. 2022); *Martin v. Ohio State Univ. Found*., 742 N.E.2d 1198, 1209 (Ohio App. 10th Dist. 2000). "A negligent misrepresentation claim does not lie for omissions: there must be an affirmative false statement." *Martin*, 742 N.E.2d at 1209.  *See also Nazareth Deli LLC*, 200 N.E.3d at 669.

Because it is dispositive, the Court begins (and ends) with Remington's argument that the Hotels' negligent misrepresentation claim fails because it is improperly "premised on promises of future contractual performance."  (Doc. No. 19 at PageID#s 230-231.)  In its Motion, Remington notes that the Hotels' claim is based on the allegation that Remington misrepresented its "willingness

25

and ability to achieve specific financial results" for the Hotels.  (*Id.*)  Remington asserts that "such an allegation cannot sustain a negligent-misrepresentation claim under Ohio law because '[t]he false information element requires a representation as to 'past or existing facts, not promises or representations relating to future actions or conduct.'"  (*Id.*) (quoting *GEM Indus. v. Sun Tr. Bank*, 700 F.Supp.2d 915, 923 (N.D. Ohio 2010)).  Remington maintains "this limitation is necessary to prevent negligent-misrepresentation claims from invading the province of a breach-of-contract claim, which is necessarily based on a promise of future conduct."  (*Id.*)

In response, the Hotels argue that their negligent misrepresentation claim "is not simply about Remington's broken promise, but Remington's misrepresentation about its capabilities at the time the parties negotiated the HMAs."  (Doc. No. 22 at PageID# 273.)  The Hotels assert that Remington "had more than enough information at its disposal to reasonably evaluate its capability to achieve the *pro formas* prior to executing the HMAs" but "in its rush to pressure The Hotels into entering the HMAs ..., misrepresented its ability to achieve the projections and that it was the only management company capable of achieving the projections." (*Id.*) (citing Doc. No. 16 at ¶¶ 15-17.)  The Hotels further argue that this issue cannot be resolved at the pleading stage and is best resolved after the completion of discovery.  (*Id*. at PageID# 274.)

In its Reply Brief, Remington argues that "[t]he rule preventing negligent-misrepresentation claims from invading the province of contract applies not just to claims alleging solely that a defendant breached a promise" but "also bars claims based on representations *relating to* future actions or conduct."  (Doc. No. 29 at PageID# 323) (emphasis in original).  Remington asserts that, "[w]ere it otherwise, every alleged breach of contract could be used to support a tort claim based on the allegation that the counterparty misrepresented its willingness and ability to perform."  (*Id*. at

PageID#s 323-324.)  Remington maintains that the Court should not defer ruling on this issue until after discovery "when [the Hotels'] pleading itself demonstrates that this claim fails as a matter of law." (*Id*.)

As set forth *supra*, the second element of a negligent misrepresentation claim in Ohio is the that the defendant "suppl[y] false information for the guidance of others in their business transactions." *See Abboud.,* 711 Fed. Appx. at 777.  As Remington correctly notes, Ohio courts have held that this "false information" element requires a representation as to "past or existing facts, not promises or representations relating to future actions or conduct." *Telxon Corp. v. Smart Media of Del., Inc*., 2005 WL 2292800 at *13 (Ohio App. 9th Dist. Sept. 21, 2005).  *See also GEM Industries, Inc.*, 700 F.Supp.2d at 923. "A tort claim for negligent misrepresentation is thus distinguished from a breach of contract claim, which is necessarily based on a promise of future conduct."  *GEM Industries, Inc.,* 700 F.Supp.2d at 923.

As one court explained, "[p]redictions as to future events do not constitute actionable misrepresentations under the law of Ohio."  *Risner v. Regal Marine Industries, Inc.,* 8 F.Supp.3d 959, 1002 (S.D. Ohio 2014) (finding that "[i]nsofar as plaintiff relies on Regal's promises of future satisfaction, his allegations are not actionable under a theory of negligent misrepresentation.").  Or, as another court held, "[a] claim for negligent misrepresentation is based on false information, not a broken promise." *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm'n*, 913 F.Supp. 1031, 1041 (N.D. Ohio 1996).  *See also Oak Acres Nursery, LLC v. Stinchcomb Nursery Sales, Inc.,* 2013 WL 391175 at * 11 (N.D. Ohio Jan. 30, 2013) ("Generally, courts treat broken promises as breaches of contract, not misrepresentations. *** Because broken promises are the subject of numerous other areas of law, and because it can find no authority for doing so, the Court will not extend the tort of

negligent misrepresentation to include broken promises, particularly not where the plaintiff has not shown the defendant did not have the intent to keep the promise at the time he made it.") (internal citations omitted); *Isaac v. Alabanza Corp.*, 2007 WL 901596 at * 7 (Ohio App. 7th Dist. March 22, 2007) (similar).

Here, the Court finds that the Hotels' negligent misrepresentation claim fails as a matter of law because it is based on Remington's alleged misrepresentations of future performance, rather than a false statement of existing fact. As noted above, in their Counterclaims, the Hotels allege that, during contract negotiations, Remington (1) "promised The Hotels that Remington would guarantee its *pro forma* projections;" (2) "guaranteed it would hit these *pro formas* and would even include this guarantee within the management agreements themselves;" and (3) "represented to [the Hotels] that Remington was the only company that could hit the *pro forma* projections for The Hotels." (Doc. No. 16 at PageID# 199, ¶ 17.) Based on these factual allegations, the Hotels allege in Count I that "in the course of negotiating the HMAs with The Hotels, Remington made various factual misrepresentations and misstatements to The Hotels regarding Remington's willingness and ability to achieve the specific financial results for The Hotels." (*Id.* at PageID# 205, ¶ 44.) The Hotels allege "Remington's misrepresentations were, in fact, false" and that "Remington knew, or should have known, that it was unable to achieve its promised annual financial results." (*Id.* at ¶ 45.)

The Court finds that each of the above allegations relate to Remington's assurances regarding its predicted future performance under the HMAs. Indeed, in the paragraph setting forth Remington's alleged misrepresentations during contract negotiations (Paragraph 17 of the Counterclaim), the Hotels' allegations are all plead in terms of what Remington promised it "would do" if the Hotels engaged Remington to manage the four hotels at issue. These are quintessential allegations of

28

representations regarding future performance under the HMAs – not allegations of representations of any specific, existing fact that would support a negligent misrepresentation claim.

In so finding, the Court rejects the Hotels' assertion that this claim survives because it is based on Remington's alleged misrepresentation regarding its "willingness and ability" at the time of contract negotiations to achieve the specific financial results in the *pro formas*.  As discussed above, Remington's alleged misrepresentations regarding its ability to achieve the *pro formas* are defined in terms of future conduct (i.e. that it "would achieve" the *pro formas* in the course of performing under the HMAs), rather than any specific, existing fact about Remington's capabilities at the time of contracting.  *See GEM Indus., Inc*., 700 F.Supp.2d at 925 (noting that the "failure to predict a future event does not give rise to a negligent misrepresentation claim.")

In sum, the Court finds that the Hotels' negligent misrepresentation claim is premised entirely on Remington's alleged assurances and predictions that it "would hit the *pro formas*" set forth in the Exhibit Es attached to the HMAs.  Because as plead the alleged misrepresentations inherently involve promises of future conduct (rather than statements of existing fact), the Court finds that the Hotels' allegations fail to satisfy the false information element of a negligent misrepresentation claim as a matter of law. Accordingly, Remington's Motion to Dismiss Count I of the Counterclaims is granted.[12]

**C.      Breach of the Implied Duty of Good Faith and Fair Dealing (Counts II through V)**

---

[12] Because the Court finds that the Hotels' negligent misrepresentation claim is subject to dismissal for this reason, the Court need not (and will not) address Remington's alternative arguments that this claim should be dismissed because (1) it is "based on the incorrect premise that Remington guaranteed the *pro forma* results;" and (2) the Hotels fail to allege that Remington was "in the business of supplying information for the guidance of others" and/or that a "special relationship" existed between the Hotels and Remington.

Lastly, within their breach of contract claims in Counts II through V, the Hotels allege that "[i]n violation of its duty of good faith and fair dealing, Remington negotiated [the HMAs] with [the Hotels] without disclosing that Remington was unable to comply with" or "had no intention of complying with" its "obligations to achieve the specific annual financial results on behalf of [the Hotels]." (Doc. No. 16 at PageID#s 206-211, ¶¶ 54, 63, 72, 81.)

In its Motion, Remington argues that these allegations do not state a cognizable claim for breach of the implied duty of good faith and fair dealing because that duty "has no application to a party's conduct prior to entering into a contract, as it does not even exist until the contract is entered into." (Doc. No. 19 at PageID# 231-232.)  In their Brief in Opposition, the Hotels state that they "do not allege a separate and independent cause of action for breach of the implied duty of good faith and fair dealing." (Doc. No. 22 at PageID# 274.)  In its Reply Brief, Remington asserts that "[i]t appears that [the Hotels] have now abandoned" this claim.  (Doc. No. 29 at PageID# 324.)  The Hotels did not file, or seek leave to file, a Sur-Reply.

Based on the above, the Court finds that the Hotels have conceded that their Counterclaims do not assert a claim for breach of the implied duty of good faith and fair dealing.  Thus, Remington's Motion to Dismiss the Hotels' claim for breach of the implied duty of good faith and fair dealing is denied as moot.

## V.    Conclusion

Accordingly, and for all the reasons set forth above, Remington's Partial Motion to Dismiss Counterclaims (Doc. No. 19) is GRANTED IN PART and DENIED IN PART, as follows. Remington's Motion is GRANTED as to the Hotels' negligent misrepresentation claim in Count I of the Counterclaims.  Regarding Counts II through V of the Counterclaims, Remington's Motion is (1)

GRANTED to the extent these Counts allege that Remington breached the HMAs by failing to (a) achieve the *pro forma* financial results set forth in the "Exhibit E" documents attached to the HMAs; and/or (b) submit a proposed annual budget and business plan that incorporated the *pro forma* financial results; and (2) DENIED to the extent these Counts allege that Remington breached Section 5.03(A) of the HMAs when it failed to confer and use good faith to reach a resolution of the Hotels' rejection of Remington's proposed business plan.  Lastly, Remington's Motion to Dismiss the Hotels' claim for breach of the implied duty of good faith and fair dealing in Counts II through V of the Counterclaims is DENIED AS MOOT in light of the Hotels' concession that the Counterclaims do not assert a claim for breach of the implied duty of good faith and fair dealing.

**IT IS SO ORDERED.**


 *s/Pamela A. Barker*                           
PAMELA A. BARKER
Date:  December 12, 2025                    U. S. DISTRICT JUDGE